SOUTHERN RAILWAY COMPANY v. HARPE.

[No. 28,046. Filed December 28, 1944. Rehearing denied January 30, 1945.]

*Phelps F. Darby,* of Evansville, and *Telford B. Orbison,* of New Albany, for appellant.

*Robert R. Kelso* and *Lorch & Lorch,* all of New Albany, for appellee.

FANSLER, J.—The appellee, a section foreman employed by the appellant, brought this action to recover damages alleged to have resulted from the negligence of the defendant by reason of which he was struck by a train and injured. There was a judgment for the plaintiff.

Many errors are assigned, but we need only consider the assignments in the motion for a new trial questioning the sufficiency of the evidence and an instruction.

There are two averments of negligence. One is that the track supervisor, Frank Anson, under whose direction the plaintiff was working, told the plaintiff that the east bound passenger train would pass on the "passing track," and that because of his reliance on this statement he was injured. The other is that a town ordinance of the town of English, adopted in 1897, fixed a speed limit of four miles per hour, and

that the passenger train, when it struck the plaintiff, was exceeding that speed.

There is little conflict in the evidence. The plaintiff had been employed by the defendant as a section foreman for more than thirty years. Frank Anson had been employed as a track supervisor for 26 years. On the day in question, the section crew of which the plaintiff was foreman and two other crews were working under the direction of Anson a short distance west of the town of English. At about 3:30 o'clock in the afternoon they stopped work and started on their motor-driven section cars toward English. The railroad tracks run approximately straight east and west through the town. In addition to the main track there is a passing track about a quarter of a mile long south of the main track. When the section cars approached the switch point leading off the main track to the passing track at the west there was a freight train switching. The section men stopped until the switching was finished. The plaintiff testified that Anson went to the freight engine and talked to the engineer; that he came back and said: "Now 23 (a passenger train) will be here in a few minutes. You fellows get your cars to the car-house and put them off; 23 is going to take the passing track. You get off and wait until they go by; then you can go home." The "car-house" is also called the tool-house. It is located about 500 feet east of the west switch point. The freight train was too long to be contained on the passing track, and the plaintiff testified that under such circumstances passenger trains would at times head in on the passing track and permit freight trains to pass on the main track. The section cars proceeded to a point opposite the car-house, where the cars were removed from the tracks, and the men sat on some

kegs on the north side of the main track. They sat there about 15 minutes before the passenger train whistled for the station. The plaintiff testified that after the train whistled one of the men said: "He will hit that water keg." The plaintiff looked and saw a 16-gallon wooden keg, which was used for drinking water on one of the section cars, sitting on the north end of the ties on the passing track, on the outside of the rail. He testified that when no one made any attempt to move it, he went to get it, intending to pull it between the tracks so that it would be in the clear. When he got up he saw the passenger train. He went between the tracks, moved the keg, and started back, and, as he stepped on the main track, he was struck by the passenger engine, which was traveling not to exceed 10 miles an hour. He said that he was "sure 23 was by me," and that he "thought 23 was coming in back of me." He did not look, but said: "I made about two steps and with my left leg between the two rails of the main track I saw something at the side of me and it was the engine. . . . That was the first time I saw the engine after I went over across the track." He said he believed the passenger train would be on the passing track because Anson said that it would, and he thought he knew what he was talking about. He was knocked to the ground and an arm and a leg were broken and he was otherwise injured. Mr. Anson testified that he talked to a brakeman, who said there was going to be a "saw-by," which means that when a train is longer than the passing track, it has to come in and let the other train pass, and that: "From what the brakeman told me and from the maneuvers of freight train 66, I assumed the passenger train would take the passing switch"; that he told the plaintiff and the other foreman "to take their cars

to the car-house and put them off and stay in the clear until the saw-by was completed"; that in stating that the passenger train would take the passing track he was only expressing his own opinion; that no one had told him so. Anson followed the section cars to the car-house and sat down on a keg next to the plaintiff, where they engaged in conversation for 12 or 15 minutes; that he then noticed a water keg between the tracks, and said: "Whose keg is that?"; that he thought it was in the clear; that some minutes after he referred to the keg, the plaintiff got up, and, without any instructions from any one, started across the main track; that Anson said to him: "Gussie, look out"; that when Harpe started the passenger train was in plain view and he hardly had time to get across the track. Several section men testified that Anson shouted a warning to Harpe when he started toward the track.

It is clear that when Anson made the statement that the passenger train would pass on the passing track it was not intended to be acted upon, since at the same time he directed the plaintiff and all the men to get off and wait until both trains went by and then to go home. When the plaintiff, of his own volition, and contrary to the directions from his supervisor to stay off, started back upon the track, he was warned to "look out."

Negligence is a failure to exercise that degree of care which a person of ordinary prudence would exercise under like circumstances, and it must be measured in the light of some danger that is reasonably to be anticipated. "What is proper care and caution in a given situation is gauged by the danger which is to be reasonably apprehended 'un-

der circumstances existing at the time, and not by looking backward after the accident has happened.'" "An injury that could not reasonably have been anticipated will not be imputed to negligence." *Parry Manufacturing Co.* v. *Eaton, etc.* (1908), 41 Ind. App. 81, 90, 91, 83 N. E. 510, 513, 514. "One is not bound to guard against a happening which there is no reason to anticipate or expect." *L. S. Ayres & Co.* v. *Hicks* (1942), 220 Ind. 86, 93, 40 N. E. (2d) 334, 337, 41 N. E. (2d) 195, 356. Mr. Justice Moody said, in *Atchison, etc., Ry. Co.* v. *Calhoun* (1909), 213 U. S. 1, 9, 29 S. Ct. 321, 323, 53 L. Ed. 671, 675: "It has been well said that 'if men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things.' Pollock on Torts, 8th ed., 41." At the time Anson made the statement about the passenger train passing on the passing track, it could not reasonably be anticipated that the plaintiff would go upon the track immediately in front of the passenger train without looking to see whether he was in danger, especially in the light of the direction issued at the same time—that he was to get off the tracks and stay off until the trains had gone. Afterward the water keg was inadvertently left between the tracks. But this was an inadvertence not reasonably to have been anticipated, and even after it was noticed upon the tracks it was not thought by Anson, the employee in charge, that it was necessary for any one to go for

it. In going on the tracks, the appellee was not acting upon the orders, or working under the supervision, of Anson; he was acting contrary to orders and instructions. As a section foreman he seems to have felt some responsibility for the equipment. At any rate, he acted upon his own initiative and contrary to Anson's directions. The facts are not sufficient to charge Anson personally with reponsibility for the injury, and therefore they are not sufficient to charge his master.

Negligence is predicated upon the violation of an ordinance of the town of English limiting the speed of trains to four miles an hour, and the court instructed the jury in effect that the operation of its trains in excess of the speed limit provided by this ordinance was negligence *per se*. This ordinance was enacted in 1897. We find no statute which at that time authorized towns to enact ordinances regulating the speed of trains, although there was a statute authorizing cities "to regulate the speed of railroad trains through the city . . ." Acts 1895, ch. 88, § 1, p. 180, § 3541, Burns' 1901. The regulation of railroad traffic falls within the police power. In *City of South Bend* v. *Chicago, etc., R. Co.* (1913), 179 Ind. 455, 457, 101 N. E. 628, 629, it is said: "In numerous decisions this court has held that municipal corporations can exercise only, (1) powers granted in express words, (2) those necessarily or fairly implied, or incidental to the powers expressly granted; and, (3) those essential to the declared objects and purposes of the corporation." Whether express or implied, the power must flow from a legislative grant. Where they are treated as implied, or essential to the declared objects and purposes of the corporation, it is assumed that the Legislature intended the powers to be exercised because of their incidental or essential

character. Unless it can be assumed that the Legislature intended to grant the power, it must be concluded that the power is non-existent. Since the power to regulate the speed of trains was expressly granted to cities, it cannot be supposed that the Legislature intended towns to exercise the same powers in the absence of an express grant. The view that towns were not intended to exercise powers equal to those granted to cities is confirmed by the provision of the Cities and Towns Act of 1905, in which towns are granted power "to regulate the running of railroad trains, street and interurban cars and all other vehicles on or across the streets and alleys of the town . . ." (§ 48-301, Burns' 1933, § 11358, Baldwin's 1934, clause 12), while cities are empowered "to secure the safety of citizens and other persons in the running of trains or cars in and through any such city . . ." (§ 48-1407, Burns' 1933, § 11432, Baldwin's 1934, clause 49). The power of towns is limited to the protection of highway crossings. Police powers granted to municipal corporations are not irrevocable, and even where a power has been considered as vested in the municipality because essential or incidental to express grants, later legislation expressly granting more limited powers must be construed as curtailing broader powers previously enjoyed or as an indication that there was no legislative intent to grant the supposed incidental or essential powers. If the ordinance, though enacted prior to 1905, is to be treated as effective in so far as the town was authorized to act by the act of 1905, it affects only the speed of trains crossing public highways and protects only persons using or intending to use highway crossings. An employee of the railroad, working on its right of way, and not at a crossing, is not within the protection of the statute. *Hill* v.

*Chicago, etc., R. Co.* (1919), 188 Ind. 130, 122 N. E. 321, and cases cited; *New York, etc., R. Co.* v. *Martin* (1905), 35 Ind. App. 669, 72 N. E. 654. The numerous cases involving *city* ordinances are not in point, since the statute conferring powers upon cities authorizes ordinances "to secure the safety of citizens and other persons in the running of trains or cars in and through any such city . . . ," and is not limited to the protection of highway crossings.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.

Note.—Reported in 58 N. E. (2d) 346.