JAMES N. PARR, LOUISE ALSTON PARR *v.* ROOSEVELT McDADE.

[No. 2-1072A87. Filed July 31, 1974. Rehearing denied September 5, 1974.]

*G. Ronald Heath, Thomas P. Ledgerwood,* of Indianapolis, for appellants.

*George E. Martz, Forrest B. Bowman, Jr., Richard Kammen,* of Indianapolis, *David E. McClure,* of Indianapolis, for appellee.

WHITE, J.—Mr. and Mrs. Parr, owners of an apartment house (owners), appeal from a $50,000.00 judgment rendered against them on a jury verdict in favor of Roosevelt McDade, a tenant who was injured when he jumped from his second floor apartment to escape a fire which had originated in an apartment occupied by owners' resident manager. The fire was concentrated in a children's bedroom being

heated by an open-flame gas space heater which the resident manager had told Mr. Parr was dangerous. He had promised, but failed, to replace it with a hot water radiator.

Finding no reversible error we affirm.

A proper grasp of the issues raised by the contentions of error relied on for reversal requires a more detailed statement of the facts. In formulating that statement we look to the undisputed facts and, where the evidence is conflicting, to that evidence and the reasonable inferences therefrom which are most favorable to the appellee. *Palmer* v. *Decker* (1970), 253 Ind. 593, 255 N.E.2d 797; *Estate of Barnett* (1974), 159 Ind. App. 491, 307 N.E.2d 490.

Owners acquired the apartment house located at 1301 Broadway, Indianapolis, by purchase in December of 1965. Its condition then and at the time of the fire, November 25, 1968, was substantially the same. (At the time of the trial owners no longer had any connection with the building. Neither did McDade nor his witness, the resident manager, Mrs. Mayme Willis.) It was a two story frame building containing six apartments. Heat was furnished to all apartments from one gas-fired, hot-water furnace. Each room in the building, with the exception of the back bedroom in apartment No. 2, on the first floor, contained a hot water radiator which heated it. The heating device in this bedroom was an open-flame vented, gas space heater attached to the building.

At the time of the fire, and for some four months prior thereto, this No. 2 apartment was occupied by Mrs. Mayme Willis and her three small children. Mrs. Willis was employed by the owners as resident manager. Her duties included using the apartment as a collection spot for the rents which the tenants of other apartments brought there to her. She also cleaned the hallway, cleaned vacant apartments, showed them to prospective tenants, and rented them. Her most valuable service, in Mr. Parr's opinion, "was being there" and for that purpose No. 2 was the logical apartment and he let her have it rent free. He paid her no other compensation.

Immediately prior to the time that Mrs. Willis moved into apartment No. 2 with her children in July of 1968, she had been living in a house at another location with her husband Jesse. At that time, although not living on the premises, they were nevertheless acting together as the manager of the 1301 Broadway building and were being compensated by separate checks. They had first become managers in 1966 when they were living on the premises in a second floor apartment as rent paying tenants. When the prior manager left Mr. Parr employed them and compensated them by charging them no further rent.

In 1966 when she was acting with her husband as resident manager and living in the second floor apartment, Mrs. Willis first became aware of the gas heater in the No. 2 ground floor apartment. (Mr. Parr had known of its existence, though not of its danger, from the time he bought the building.) Two tenants who lived there at that time complained about the heater being dangerous. Mrs. Willis told Mr. Parr and he said he would have a radiator put in. When she herself moved into that apartment in 1968 she did not think of the gas heater until it got cold weather and she had to light it to heat the room for her children who slept there. It was then that she noticed that the flame was just an open flame and when it was lighted and turned up the flame would come all over the heater. There was no cover on it. Much of her description of the heater is not in the record. Without objection, she drew a picture of it with chalk on a board when she said she couldn't describe how it looked but could draw a picture of it.

In 1968 she again told Mr. Parr about the heater and he again promised to replace it with a radiator.

Plaintiff-appellee Roosevelt McDade became a tenant of a second floor apartment in the building some four to six months prior to the fire. Apparently his lease was parol (either week-to-week or month-to-month) with no express covenants by the landlord. He was unmarried and was the

apartment's sole occupant. He knew nothing of the existence of the gas heater until after the fire.

On the night of the fire it was cold weather and the gas space heater was burning in the bedroom when Mrs. Willis put her children to bed. The flame was turned low. She went to sleep in the living room. Some time later, she was awakened by her children screaming. She ran into the kitchen and saw the two boys trying to push the baby bed out of the bedroom into the kitchen but it was stuck in the doorway. At that time the fire was all confined to the bedroom. There was no fire in the kitchen. She picked the baby up, pushed the bed back to let the boys through the doorway and then pushed them ahead of her as she carried the baby out the front door. The fire department arrived quickly and rescued several people from the second floor. McDade, on the other side of the building, found his exit blocked by smoke and heat.

Getting no answer to his calls for help, he jumped, breaking a leg. (Appellants do not contend on appeal that his injury was not a proximate result of the fire or that he was guilty of contributory negligence as a matter of law, so the details of his jump are not significant. For like reasons the details of his injury and damage are also omitted.)

Most of the gas heater was removed from the building by the city firemen who extinguished the fire and the remainder (e.g., the vent and gas pipe) was removed by owners when repairs were made. There was no evidence of the condition or appearance of the heater after the fire, nor of the condition or appearance of other fire debris or residue, and no expert testimony as to the cause of the fire. Nevertheless, the fact that the fire originated in, and was largely confined to, the only room in the building in which there was an open flame makes reasonable the inference that the open flame heated some flammable material to the point of ignition, thereby precipitating the fire. We believe no more need be said of appellants' contention that there was no evidence of the "actual cause" of the fire.

## I.

Many, perhaps most, of the trial court's rulings to which appellants take exception are reversible error only if the fire was *not* the proximate result of a breach, or violation, by the owners, of some duty owed by them to the plaintiff-appellee, Roosevelt McDade. The crucial question, then, is this: Did owners owe Roosevelt McDade the duty of bringing to an end the practice of burning the open gas flame to heat the bedroom in the resident manager's apartment, or to warn McDade of the practice?

Appellee supports his argument for an affirmative answer to that question by citing, among other authorities, *Indianapolis Abattoir Co.* v. *Temperly* (1902), 159 Ind. 651, 653, 64 N.E. 906, 907, wherein the court said:

> "The first objection taken to the complaint is that it does not appear that the appellant, as landlord, violated any duty which it owed to the appellee as its tenant. While it is true that in this State a landlord can not be compelled to make repairs in the absence of an agreement to do so, and is not responsible for injuries resulting from such failure to repair, yet it is equally well settled that where he occupies a portion of the premises himself he is not permitted to use such parts in such manner as to injure his tenant."

In the *Abattoir* case it is clear that the landlord did occupy a portion of the premises itself as its own office (not as anyone's living quarters). In the case at bar occupation by the owners of Mrs. Willis' apartment may not be so readily apparent. Had the apartment been used by Mrs. Willis *only* as management headquarters no one would doubt that her occupancy of it was as owners' employee and they were thereby in possession of apartment No. 2. Owners, however, contend that because she used the apartment also as family living quarters she occupied it as a tenant and not as their employee. But there was ample evidence in Mr. Parr's own testimony that by living in this apartment she was performing a duty of her employment as well as compensating herself for the other duties she per-

formed as manager.[1] " 'Where the occupation of a house by a servant is connected with the service, or is required by the employer for the necessary or better performance of the service, the occupation is as servant, not as tenant, and the possession is that of the master.' " *Chatard, Bishop* v. *O'Donovan* (1881), 80 Ind. 20, 28, quoting *Kerrains* v. *People,* 60 N.Y. 221. *Chatard* was a suit by a Catholic bishop against a discharged parish priest for possession of the living quarters furnished by the Church to the priest. Holding that the bishop was entitled to possession, the court said:

> "While it may not be said, . . . that the defendant [priest] was the hired servant of his Bishop, it does appear that he was appointed to his position by and held it at the discretion of the Bishop, and that his possession of the property was only an incident to his appointment, the better to enable him to discharge the duties of his office, and when, in the exercise of that discretion, which by the rules and customs of the church he had the right to employ, the Bishop removed the defendant from his charge or pastorate over the congregation, his right to possession of the property at once necessarily ceased." (Id., 80 Ind. at 30.)

In *Fulton* v. *Heffelfinger* (1899), 23 Ind. App. 104, 107, 54 N.E. 1079:

> "The evidence showed that the appellee commenced his services upon the farm in February, 1896, and that in February, 1897, there was an agreement that he should continue for the second year upon the same terms of employment, as to which there was some conflict in the testimony. The appellee's employment on the farm consisted of general farm work, cultivating the crops, and caring for the live stock. It appeared that he was to have, and did have, the use of the dwelling-house on the farm, and a garden adjoining it; also that he was to cultivate and to have as a part of his remuneration, in addition to his cash wages, one-half the products of certain 'truck patches' on the farm, the appellant to have the other half. The appellee also, pursuant to the contract, furnished boarding and lodging to the other farm hands and meals to the harvest hands, at stipulated prices to be paid him by the appellant. . . .

---

1. He said: ". . . the most valuable service that really that Mayme or any resident manager performed was being there. . . ."

"The appellee occupied and used the house, garden, and truck patches, by way of remuneration in part for his services, and in the capacity, not of a tenant, but of a servant, for the benefit of the appellant, and necessarily for the convenient performance of the service of cultivating the farm and caring for the live stock and boarding the appellant's other employes. His possession was not independent of the appellant, but was the possession of the appellant through his servant. *Chatard* v. *O'Donovan*, 80 Ind. 20, 41 Am. Rep. 782." See also *Heffelfinger* v. *Fulton* (1900), 25 Ind. App. 33, 56 N.E. 688; *Jump* v. *Pilgrim Properties, Inc.* (1947), 118 Ind. App. 164, 75 N.E.2d 165.

Although Mr. Parr testified that he "did rent an apartment to" Mrs. Willis and "[s]o, Mayme, too, was a tenant in the apartment building," there is nevertheless ample evidence that her apartment was under the owners' control by virtue of the employer-employee relationship between owners and her.

The evidence of that relationship justified the court's overruling of owners' objections to plaintiff's jury instructions No. 1 and 4 which read as follows:

(No. 1) "A landlord has the duty to use ordinary care to keep in a reasonably safe condition that part of the premises over which he exercised or retained control."

(No. 4) "Where a portion of the premises are occupied for the use and benefit of the landlord and under his control, he is not permitted to use such area in such manner as to injure his tenants. If he knows of the existence of dangerous conditions in those premises and fails to take reasonable action to correct it, he is liable for injuries that occur by reason of the existence of said dangerous conditions. Evidence that a dangerous condition complained of caused a fire resulting in danger to the plaintiff is sufficient evidence of proximate cause."

The objection to No. 1, which, in essence, was repeated as to No. 4, was that:

". . . the undisputed evidence in this case is that Mayme Willis, a tenant in the Apartment No. 2, was in possession and control of that apartment. This is an accurate statement of the law, but it is inapplicable to the facts in this premises of Mr. McDade's apartment or of Mayme Willis'

apartment. It's confusing to the jury. It is not supported by any of the evidence in the case."

But the *mere* fact that owners were in possession and control of apartment No. 2 through their resident manager created no duty on their part to terminate use of the gas heater or to warn McDade that it was being used. If continued use of the heater created no unreasonable risk of harm to McDade it is axiomatic that no one owed him any duty to terminate its use.[2]

All of this is implied in a very few words in the court's final instruction No. 14, when it said, in part, that "[t]he plaintiff has the burden of proving . . . [t]hat the defendants were negligent in the maintenance of the gas heating unit. . . ."[3] To keep, or maintain, the heater in the manager's apartment was negligent conduct only if a reasonably prudent person would not do so because of the likelihood of its setting the building on fire.[4]

2. " 'Negligence is conduct which creates an undue risk of harm to others.' " *Cushman Motor Delivery Co.* v. *McCabe* (1941), 219 Ind. 156, 173, 36 N.E.2d 769, quoting Restatement, Torts, § 463, p. 1227, Comment b.

3. Appellants' trial court objection was that "to impose the duty on the landlord to maintain a gas heater when there is no evidence that any maintenance would have prevented the fire, is outside the evidence". The trial court commented: "I think, counsel, both you and counsel for plaintiff put too narrow a construction on the word maintenance. Maintenance isn't confined to working on it and repairing it." In its entirety the court's final instruction No. 14 reads:

"The plaintiff has the burden of proving the following propositions:

"First Proposition: That the defendants were negligent in the maintenance of the gas heating unit, that the defendants had knowledge of the conditions of the gas heating unit and that the defendants failed to warn the plaintiff of such condition after having knowledge of same.

"Second Proposition: That the plaintiff was injured.

"Third Proposition: That the negligent act or omission of the defendants was a proximate cause of the plaintiff's injuries.

"If you find from a consideration of all the evidence that these propositions have been proved then your verdict should be for the plaintiff. However, if you find from a consideration of all the evidence that any of these propositions have not been proved, or if you find that plaintiff himself was guilty of contributory negligence, then your verdict should be for the defendant."

4. " 'The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can fore-

Although reasonable people might differ in their evaluation and interpretation of Mrs. Willis' testimony relating to the danger she said was involved in heating the bedroom with the gas heater, we believe they would agree that it is sufficient to authorize a jury finding that a reasonably prudent person would not so use it because the risk of its starting a fire was too great. We must, therefore, presume that they made such a finding.[5] Mrs. Willis' use of the heater was therefore negligent as to her children and as to all other persons in a position to be endangered by any fire it might start, and known to her to be in such dangerous proximity. This we believe no one disputes nor do we understand how logically they could do so. McDade was obviously very likely to be so located, which she well knew because she knew he had rented apartment No. 4. As to McDade and other adults able to protect themselves by removal, she could have avoided liability by giving timely warning. That she did not do.

There was no relationship of landlord and tenant between Mrs. Willis and Mr. McDade. In fact, there was no legally significant relationship between the two that did not exist between either of them and any other person, except their proximity. They occupied apartments close enough to each other that an unfriendly fire in one endangered the occupants of the other. That situation could have existed had their apartments been separately owned or even if they had been in separate buildings.

One has no difficulty accepting the premise that Mrs. Willis' duty to Mr. McDade arose out of his known proximity because her duty is clearly a negative duty, a duty not to actively (though unintentionally) create an unreasonable risk of harm.

cast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things.' Pollock on Torts, 8th ed., 41." *Southern Railway Company* v. *Harpe* (1944), 223 Ind. 124, 130, 58 N.E. 2d 346, quoting *Atchison, etc., Ry. Co.* v. *Calhoun* (1909), 213 U.S. 1, 9, 29 S. Ct. 321, 323, 53 L. Ed. 671, 675.

5. *Estate of Barnett* (1974) 159 Ind. App. 491, 307 N.E.2d 490.

One, however, has more difficulty accepting the proposition that owners breached a duty arising out of proximity. That difficulty stems from the feeling that such a duty would be an affirmative duty and mere proximity is usually not sufficient to create an affirmative duty to prevent injury to another. It is necessary to find some relationship other than location to give rise to such an affirmative duty.[6] On first blush, at least, it appears that owners are being held liable here because they did not take affirmative action to prevent, or render impossible, Mrs. Willis' negligent use of the gas heater. Appellants' arguments assume that the only relationship out of which such an affirmative duty could arise is the landlord-tenant relationship between owners and McDade. They explore that relationship and find no such duty. They also claim that insofar as Mrs. Willis' use of the heater is concerned her only relationship to the owners was that of tenant. For her acts in that capacity, they cite authority that owners as her landlords are not liable.[7] They acknowledge that she was also owners' employee but convincingly argue that her use of the heater was not an act within the scope of her employment; it was solely for the comfort and convenience of herself and family. Appellee disclaims reliance "upon *respondent* [sic] *superior*" and says that he relies solely on owners' negligence. Their negligence, says appellee, was their failure to "remedy" a dangerous situation of which they had notice and which was located on premises of which they had control by reason of their employer-employee relationship with its occupant, Mrs. Willis. To "remedy" the situation was to prevent Mrs. Willis from using the gas heater. Mrs. Willis asked them to do that by making its use unnecessary by providing a hot water radiator to heat the bedroom. They promised to do that but gave no order to

---

6. See *L. S. Ayres & Company* v. *Hicks* (1942), 220 Ind. 86, 95, 40 N.E.2d 334, 337; *Tubbs* v. *Argus* (1967), 140 Ind. App. 695, 699, 225 N.E.2d 841.

7. *Smith* v. *Cities Service Oil Co.* (7th Cir. 1965), 346 F. 2d 349; *Metzger* v. *Schultz* (1896), 16 Ind. App. 454, 43 N.E. 886; *Bailey* v. *Kelly* (1915), 93 Kan. 723, 145 P. 556, and other authorities.

their employee not to use the heater pending replacement or to warn McDade and others of the danger or to disconnect the heater. They thus permitted their employee to use the heater on premises she was privileged to enter only as their resident manager.

The principles enunciated in §§ 315 and 317 of Restatement 2d, Torts, are pertinent to that situation:

## "TITLE A. DUTY TO CONTROL CONDUCT OF THIRD PERSONS.

"§ 315.   General Principle

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

\* \* \*

"§ 317.   Duty of Master to Control Conduct of Servant

"A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if

(a)  the servant

(i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or

(ii) is using a chattel of the master, and

(b)  the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

"See Reporter's Notes.

"Comment:

"*a. The rule stated in this Section is applicable only when the servant is acting outside the scope of his employ-*

*ment.* If the servant is acting within the scope of his employment, the master may be vicariously liable under the principles of the law of Agency. See Restatement of Agency, Second, Chapter 7. (Our emphasis.)

"b. *Master's duty to police his premises and use made of his chattels.* A master is required to police his own premises, and those upon which, though in the possession of another, he has a privilege of entry for himself and his servants, to the extent of using reasonable care to exercise his authority as a master in order to prevent his servant from doing harm to others. So too, he is required to exercise his authority as master to prevent them from misusing chattels which he entrusts to them for use as his servants. This is true although the acts of the servant while upon the premises or in the use of the master's chattels are done wholly for the servant's own purposes and are, therefore, outside the course of the servant's employment and thus do not subject the master to liability under the rules of the law of Agency. . . .

"c. *Retention in employment of servants known to misconduct themselves.* There may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant. Therefore the master may subject himself to liability under the rule stated in this Section by retaining in his employment servants who, to his knowledge, are in the habit of misconducting themselves in a manner dangerous to others. . . ."

In *Mallory* v. *O'Neil* (Fla. 1954), 69 So.2d 313, the owner of an apartment house

"employed one Henry Hazelhurst as his agent and caretaker, who occupied one of the apartments. The duty of Hazelhurst was to make minor repairs, water the grass, hear complaints and keep the apartment house in rentable condition. It is further alleged that on September 11, 1951, Hazelhurst went to his apartment, secured a gun, returned and shot the plaintiff and crippled her for life, that defendant knew or should have shown that Hazelhurst had vicious propensities and was a dangerous character. . . ." (Id. at 314.)

"We are of the view that the second count or cause of action is sufficient to state a cause of action. It is grounded on negligence of the defendant in knowingly keeping a dangerous servant on the premises which defendant knew or should have known was dangerous and incompetent and liable to do harm to the tenants. Into this doctrine the

appellant has attempted to infuse (and confuse) the doctrine of respondeat superior. We do not think however, that the allegations of the complaint state a cause of action based on the doctrine of respondeat superior. . . ." (Id. at 315.)

"Other jurisdictions have considered the negligence of the master in knowingly keeping a dangerous servant on the premises and have held the master liable for the acts of his servant outside the scope of his authority if trespassing on the rights of those legally on the master's premises whether the servant acted wilfully, maliciously or negligently. Cressy v. Republic Creosoting Co., 108 Minn. 349, 122 N.W. 484; Allertz v. Hankins, 102 Neb. 202, 166 N.W. 608, L.R.A. 1918F, 534; Hall v. Smathers, 240 N.Y. 486, 148 N.E. 654; Livingston v. Gennert, Sup., 165 N.Y.S. 989, 15 A.L.R.2d 857.

"The doctrine of these cases was approved in Restatement of Torts, § 317. It seems to be a sound rule and should be applied in this case." (Id. at 315.)

Whether on the rationale of *Indianapolis Abattoir Co.* v. *Temperly, supra* (159 Ind. 651) and *Chatard, Bishop* v. *O'Donovan, supra* (80 Ind. 20) or of §§ 315 and 317, Restatement 2d Torts, quoted *ante,* owners were using apartment No. 2 in a manner which created an unreasonable risk of injury to McDade. They knew of the dangerous condition in that apartment created by the gas heater's use therein and they failed to warn him or to take reasonable action to correct it. In so doing they violated a duty they owed McDade and their conduct as to him was negligence. The court's instructions to that effect (Court's final Nos. 12 and 14 and Plaintiff's Nos. 1, 2 and 4) were proper.[8] Nor did the court err in his several rulings that the evidence was sufficient to take the case to the jury and to sustain the jury's verdict for plaintiff.

---

8. The substance of plaintiff's instructions No. 1 and 4 and the court's No. 14 have been stated.

The court's instruction No. 12 reads:

"The plaintiff claims that the heating unit maintained by the defendant was a dangerous instrument. A machine or instrument is dangerous if danger, hazard or risk may be reasonably anticipated from the use of it.

"A person who maintains a dangerous instrument or condition on his premises has a duty to use reasonable care to protect or guard

## II.

Owners contend that the giving of plaintiff's tendered instruction No. 5 was error. It reads:

"One placed in a position of danger by the negligent action of another, which position requires immediate and rapid action, without adequate time to deliberate as to the better course to pursue, is not held to the strict accountability required of one situated under more favorable circumstances. Contributory negligence is not necessarily chargeable to one on his failure to exercise the greatest prudence or best judgment in such a case. If a person acts naturally in case of sudden peril, he may not be guilty of contributory negligence, even though afterwards it may appear that another course of conduct might have avoided the injury."

Appellants' objection is that this instruction is an improper statement of the doctrine of sudden emergency. The argument presented, in essence, is a phrase by phrase comparison between this instruction and a differently worded sudden emergency instruction which, appellants contend, was "approved" by our Supreme Court in *Baker* v. *Mason* (1968), 253 Ind. 348, 242 N.E.2d 513, 16 Ind. Dec. 285, and by this court in *Faulkner* v. *Waterman* (1972), 153 Ind. App. 573, 288 N.E.2d 269, 33 Ind. Dec. 282.[9]

the dangerous instrument, or to give timely warning of such condition after having knowledge of the same; and when he can reasonably anticipate that other persons might come into contact with the dangerous instrument, and such a contact is reasonably sure to inflict serious injury, he should take whatever steps are reasonably necessary to prevent injury."

The only sentence of plaintiff's instruction No. 2 to which appellant objects here is this:

"Where premises are rented for profit and are to be used for purposes for which they are not fit or safe, and all of this was known or ought to have been known to the landlord, he is liable for injuries resulting from such use."

9. The "sudden emergency" instruction quoted in *Baker*, *supra*, [253 Ind. at 349, 242 N.E.2d at 514, 16 Ind. Dec. at 286] reads, in pertinent part:

"You are instructed that where a person is confronted with a sudden emergency, without sufficient time to determine with certainty the best course to pursue, she is not held to the same accuracy of judgment as would be required of her if she had time for deliberation. Accordingly, if she exercises such care as an ordinarily prudent person would exercise when confronted by a like emergency, she is

However, *Baker* and *Faulkner* were not concerned with the precise wording of the sudden emergency instruction but with whether the facts adduced at trial entitled a party to have such an instruction given and whether, absent such evidence, it was reversible error to give the instruction. Furthermore, we agree with the appellee's contention that the instruction given is "an accurate paraphrase of the law of sudden emergency as set out in" *McIntyre* v. *Orner* (1906), 166 Ind. 57, 76 N.E. 750; and *Cole Motor Car Co.* v. *Ludorff* (1916), 61 Ind. App. 119, 111 N.E. 447. *Cf. Bundy* v. *Ambulance Indianapolis Dispatch, Inc.* (1973), 158 Ind. App. 99, 301 N.E.2d 791, 39 Ind. Dec. 49. Though plaintiff's instruction No. 5 could have been better phrased, semantic differences will not constitute reversible error "unless it is apparent that the jury was mislead." *Denneau* v. *Indiana & Michigan Electric Co.* (1971), 150 Ind. App. 615, 277 N.E.2d 8, 15, 28 Ind. Dec. 579, 587.

### III.

Owners claim reversible error in two rulings on admissibility of evidence.

### A.

First, the court sustained plaintiff's objection to the following question posed to plaintiff McDade on cross-examination:

"Q. Mr. McDade, have you even been convicted of a crime involving dishonesty or making a false statement?"[10]

The objection was properly sustained. As *Ashton* v. *Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210, 217, 29 Ind. Dec. 364, 374, so aptly states:

---

not liable for an injury which resulted from her conduct, even though another course of conduct would have been more judicious or safer or might even have avoided the injury."

A substantially identical instruction is found in *Faulkner, supra,* 288 N.E.2d at 270, 33 Ind. Dec. at 284.

10. Neither appellants' motion to correct errors nor their brief set out verbatim, or in substance, the question, the objection and the ruling as we held in *Daben Realty Co., Inc.* v. *Stewart* (1972), 155 Ind. App. 39, 290 N.E.2d 809, 812, 34 Ind. Dec. 505, 509, was required by Trial Rule 59(B) to present the ruling for appellate review.

"If counsel had a particular conviction in mind, he failed to make its nature known to the trial court by an offer to prove. Having determined that all crimes do not necessarily reflect on the credibility of the witness, we are of the opinion that the trial court did not err in excluding the question. It appears that the question was nothing more than a 'fishing expedition' which, if answered, would not necessarily have revealed any admissible evidence. Such information could have been gained prior to trial by *proper* utilization of discovery." (Emphasis added.)

## B.

The second ruling complained of is one which permitted the plaintiff to ask defendant-owner James N. Parr, on cross-examination, whether, when his pretrial deposition was taken, he was asked certain questions and gave certain answers. The occasion for the ruling arose in a complicated manner substantially as follows:

Mr. Parr had testified on direct examination that he had absolutely no recollection of any conversation with Mrs. Mayme Willis, his resident manager, in which she mentioned anything about a gas space heater in her apartment. He also testified that there was a hot water radiator in her bedroom. (She had testified that she had brought the gas space heater to his attention on three occasions and that there was no radiator in the bedroom.) In the course of his cross-examination he testified that his landlord management relationship with Mrs. Willis "was a business-like relationship". When asked whether it was "good", the essence of his reply was that he did not "know how to answer that". Further questions concerning his answers to deposition questions were objected to. A lengthy discussion out of the jury's presence resulted in a ruling that plaintiff's counsel could ask Mr. Parr two specified questions concerning the deposition. When the jury returned those two questions, which are the following, were asked and the following answers were made:

"Q. Now, I'll read the question again. How was your relationship with Mayme Willis as far as a landlord-

management relationship, and the answer is: Good. Do you recall that question and that answer?

"A. Yes.

"Q. O.K. Then, were you asked in your dealings with her, have you known her to be honest and candid with you? And did you answer: Yes.?

"A. I don't think so. Except for what I've heard in her testimony in this case, I would answer yes."

Consistent with their objection in the trial court, the appellants' argument here is that the ruling amounted to permitting plaintiff to bolster, or corroborate, Mrs. Willis' testimony by eliciting evidence of her general good character when her character was not in issue, citing *Peoples Trust and Savings Company* v. *Cohen* (1947), 117 Ind. App. 472, 73 N.E.2d 366. The holding of that case is that rebuttal testimony by character witnesses of plaintiff-witness' good reputation for truth and veracity is inadmissible and prejudicial where his reputation is not in issue.

Appellee responds that the questions were proper to show prior inconsistent testimony, citing *Dearing* v. *Speedway Realty Co.* (1942), 111 Ind. App. 585, 40 N.E.2d 414, and as evidence of the admission of a party, citing 12 I.L.E., *Evidence*, § 135, p. 568. To which appellants reply that a witness cannot be impeached on a collateral issue (which they say is what one witness' opinion of another witness' credibility is), citing *Abelman* v. *Haehnel* (1914), 57 Ind. App. 15, 103 N.E. 869, which holds (p. 31) that it is not proper to contradict or impeach a witness (by the rebuttal testimony of a different witness) as to testimony which has been rendered immaterial by exclusion of the instrument to which it referred.

Neither the cases cited nor the arguments appear apposite. As we view the matter the question is whether the trial court abused its discretion in the latitude allowed in the cross-examination of the defendant-witness Parr.

In *Rader* v. *Collins* (1959), 130 Ind. App. 227, 233, 161 N.E.2d 381, the court said:

"The law is well settled that the extent to which a cross-examination may be carried is largely within the discretion of the trial court. *Craig, Exrx.* v. *Citizens Trust Company* (1940), 217 Ind. 434, 450, 451, points 21-23, 24, 25, 26 N.E.2d 1006; Crumpacker, *Indiana Evidence,* Vol. 1, §§ 3430, 3431."

"In Jones Commentaries on Evidence, Second Edition, Rev. and Enl., Vol. 5, § 2333, at page 4564, it is stated:

'It is well said:

' "The right of cross-examination . . . is a valuable and substantial right, and the courts should incline to extend, rather than to restrict it. Cross-examination is the most potent weapon known to the law for separating falsehood from truth, hearsay from actual knowledge, things imaginary from things real, opinion from fact, and inference from recollection, and for testing the intelligence, fairness, memory, truthfulness, accuracy, honesty, and power of observation of the witness. It has become a truism in the legal profession that 'The testimony of a witness is no stronger than it is made by his cross examination.' " ' Citing *State* v. *Ritz,* 65 Mont. 180, 211 Pac. 298.

"In the case of *Pennsylvania Co.* v. *Newmeyer* (1891), 129 Ind. 401, 28 N.E. 860, the court states that a cause will not be reversed by reason of the extent to which cross-examination may be carried 'unless it appears that there has been an abuse of discretion to the injury of the party complaining.' The appellant did not make such contention in his objection to such questions on cross-examination."

In *Mark* v. *City of Indianapolis* (1966), 247 Ind. 511, 516, 219 N.E.2d 434, where the admissibility of evidence brought out on cross-examination of a party was in dispute, the court said:

"These matters were brought out on cross-examination where great latitude is allowed in questioning a witness. It has been stated in 30 West's Ind. Law Ency., *Witnesses,* § 113, pp. 105, 106:

'Subject to the limitation that the cross-examination of a witness must be limited to the subject matter of his examination in chief, * * * and to the exercise of a sound discretion by the trial court, * * * generally, any matter is a proper subject of cross-examination which is favorable

to the cross-examiner and tends to discredit or rebut the theory or claim of the opposing party, or which is responsive to testimony given on direct examination and tends to elucidate, modify, explain, contradict, or rebut testimony given in chief by the witness, or any logical inference resulting therefrom.' "

The specific area in which defendant Parr's direct examination testimony conflicted with witness Willis' testimony concerned only whether she had mentioned the gas heater and need for a bedroom radiator to him. That was, however, but a facet of their relationship as landlord and resident manager. Parr had previously admitted (in his deposition) that the relationship was "good" and that in his dealings with her he had always found Mrs. Willis to be honest and candid with him. Now, at trial, he characterizes that relationship as merely "businesslike" and does not know how to answer when asked whether it was "good". To confront him with whether he made these prior (and, arguably, inconsistent) statements may tend to bolster Mrs. Willis' credibility, but it also tends to impair his credibility. And the latter is a legitimate objective of cross-examination. "In cross-examination the trial court may, within its discretion, allow a wide latitude to test the credibility of the witness." *Craig* v. *Citizens Trust Company* (1940), 217 Ind. 434, 451, 26 N.E.2d 1006.

The mere fact that cross-examination for a legitimate purpose may also bring out the evidence otherwise inadmissible is not a valid reason for limiting the right to cross-examine. For example, in *Pickett* v. *Kolb* (1968), 250 Ind. 449, 453, 237 N.E.2d 105, it was held that even though in an automobile-accident-personal-injury-lawsuit, "proof of liability insurance in and of itself is not admissible", that principle cannot be expanded to the extent of denying an opposing party his right to cross-examine an expert witness as to his interest (by asking him who is compensating him), even though the answer will show that he is being paid by an insurance company.

In *City of South Bend* v. *Hardy* (1884), 98 Ind. 577, 580, 49 Am. R. 792, it was noted that:

"The limits of cross-examination, for the purpose of impeaching the credit of witnesses, have not been in all respects clearly defined and uniformly established. Much contrariety is attributable to the great latitude allowable in this regard, in some instances, in the exercise of discretion by the trial court."

If there is "contrariety" in our present decision it is attributable to appellants' failure "to show to the court that the trial court abused its discretion in the reception of evidence." *Kelley* v. *State* (1948), 226 Ind. 148, 153, 78 N.E.2d 547. But the want of clearly defined and uniformly established limits of cross-examination aimed at impeaching credibility seems to us to be more apparent than real. Every situation in which the question arises is unique. Often, as here, the written record of the proceedings which set the stage for the ruling is so complex that the appellate court, with only a written record before it, cannot be expected to understand the circumstances attending the ruling as well as does the trial judge who has seen and heard the issue develop. His good judgment of what is fair in the particular situation, and most conducive to the establishment of the truth, is better assurance of a fair trial than any mechanically applicable rule that can be devised.[11] Hence, it is only when it is apparent that "judgment" has not been exercised by the trial court that we should say it has abused its discretion and has permitted counsel to transgress the bounds which limit the right of cross-examination.[12]

---

11. "It is difficult, if not impossible, to lay down specific rules to control or limit the cross-examination of witnesses. The judge before whom the case is tried must, to a considerable extent, determine it, and in doing so, must be governed by the circumstances attending the examination. Of course, his action is subject to the supervision of an appellate or superior court, in all cases when an appeal lies. In the case at bar, there is no statement in the bill of exceptions showing the circumstances under which the proof was offered, only, as we have seen, the offer to prove the fact. We think the court committed no error in rejecting the evidence." *Oliver* v. *Pate* (1873), 43 Ind. 132, 135.

12. "The term 'discretion' is defined by 1 Bouv. Law Dict., Rawle's Third Revision, p. 884, as 'The power exercised by courts to determine

It should satisfy any practical need for uniformity to say that the extent to which a witness may be cross-examined as to prior statements, arguably inconsistent with his present testimony, is within the sound discretion of the trial court, due regard being given to the particular circumstances in which the question is asked. Applying that test here we find no error. It should be recognized, however, that we say nothing about questions not before us, such as whether or when independent rebuttal evidence is admissible to contradict a witness' answers on cross-examination. Another matter not before us is the propriety of the cross-examination questions which gave rise to the arguable inconsistency.

Since we find no reversible error, the judgment is affirmed.

Sullivan, P.J., and Buchanan, J., concur.

NOTE.—Reported at 314 N.E.2d 768.

---

a question to which no strict rule of law is applicable by which, from their nature, and the circumstances of the case, are controlled by the personal judgment of the court.' The meaning of the term 'abuse of discretion' has been held by the Supreme Court of Ohio to connote something more than an error of law or of judgment, but that 'it implies an unreasonable, arbitrary or unconscionable attitude on the part of the court.'" *Clarke* v. *Rockwood & Co.*, (Ohio App. 1960), 181 N.E.2d 59, 61.

"[I]n determining whether or not the trial court abused its discretion, it is proper for this court to consider the evidence sought to be introduced, and the circumstances under which the ruling complained of was made. Discretion is defined as the discernment of what is right or proper,—as deliberate judgment. 'Abuse of discretion * * * to justify an interference with the exercise of discretionary power, implies not merely error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency.' Anderson's Law Dict. There is nothing in the record before us to warrant the imputation of either of these particulars against the trial court. It is not a question whether his judgment was erroneous. Others might have reached a different conclusion, but the question remains, 'was there an abuse of discretion?' It must be answered in the negative." *Citizens Street Railroad Company* v. *Heath* (1901), 29 Ind. App. 395, 406, 62 N.E. 107, 111.